BLOOMER SHIPPERS ASSOCIATION and its Members, People of the State of Illinois, Illinois Commerce Commission, Patrick W. Simmons and M. S. Stuckey, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-SION and United States of America, Respondents,

and

Illinois Central Gulf Railroad Company, Intervening Respondent.

No. 81–1233.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1982.

Decided May 6, 1982.*

---

* This appeal was originally decided by unreported order on May 6, 1982. See Circuit Rule 35.

The Court has subsequently decided to issue the decision as an opinion.

James E. Weging, Sp. Asst. Atty. Gen., Thomas F. McFarland Jr., Belnap, McCarthy, Spencer, Sweeney & Harkaway, Chicago, Ill., for petitioners.

Daniel B. Harrell, I.C.C., Washington, D. C., John H. Doeringer, Chicago, Ill., for respondents.

Before PELL and BAUER, Circuit Judges, and MORGAN,** Chief District Judge.

ROBERT D. MORGAN, Chief District Judge.

This petition was filed for review of a decision of the Interstate Commerce Commission (ICC) dismissing a complaint filed by Bloomers Shippers Association (BSA), which alleged that Illinois Central Gulf Railroad Company (ICG) had violated the Interstate Commerce Act by its failure to provide adequate service upon a branch line, commonly known as the Bloomer Line, by practicing undue preference to the prejudice of BSA and its members, and by granting a petition by ICG to abandon a 63-mile segment of that line. *Illinois Central Gulf R. Co.—Abandonment*, 363 I.C.C. 690 (1980). ICG intervened as a further respondent upon this petition for review.

### Historical Background

For many years ICG and its predecessors operated the Bloomer Line, which extends for a distance of 69 miles through an agricultural area in east central Illinois. The principal commodity transported over the line in relevant recent times is grain. The movement of grain economically and efficiently by rail requires the use of 100-ton hopper cars, each of which has a loaded gross weight of 263,000 pounds. The line, constructed between 1913 and 1925, was built of secondhand 75-pound and 85-pound designation.

** The Honorable Robert D. Morgan, Chief Judge of the Central District of Illinois, is sitting by

rail.[1] Many years would pass before the advent of the 100-ton cars. The 75-pound rail is inadequate to handle 100-ton shipments. The 85-ton rail is marginally adequate for such service, but only if train speed is limited to 10 miles per hour.

In 1974, in response to shipper requests for 100-ton car service, ICG inaugurated a "gathering train" service over the line.[2] ICG moved about ten of such trains over the line from 1974 through early 1977. Because of accelerated deterioration of the line, ICG lowered the weight limit over most of the line from 263,000 to 210,000 pounds per car on March 2, 1977, precluding the further use of the 100-ton cars.

In April 1977, pursuant to the requirements of Section 1a(5) of the Act, 49 U.S.C. § 10904(e),[3] and regulations promulgated thereunder,[4] ICG filed a system diagram with the ICC which designated a 63-mile segment of the line as a segment for which abandonment would be sought. 49 C.F.R. § 1121.20(b)(1). The Act fixes a four-month minimum period of previous notice, by the filing of a system diagram before a petition for abandonment can be filed. 49 C.F.R. § 1121.23(d).

On July 20, 1977, and before the four-month notice requirement was satisfied, BSA filed a complaint with ICC alleging that ICG had violated the Act by its discontinuance of 100-ton car service on the line. 49 U.S.C. §§ 10702, 10741, 11101, 11121. On October 28, 1977, ICG filed its application to abandon 63 miles of the line. Following an investigation, ICC consolidated the abandonment and complaint proceedings and assigned the matter for oral hearings.

### The ICC Proceedings

On January 5, 1979, following a series of hearings, the administrative law judge, to whom the matter was assigned, denied the abandonment application and found that ICG had violated §§ 11101 and 10741 by its failure to provide 100-ton car service over the line. His order required ICG to upgrade the line to accommodate trains of 100-ton cars at a speed of 10 miles per hour on an as-needed basis, and to cease and desist from practicing undue prejudice to shippers on the line and undue preference of service to other shippers within its system which were denied to BSA shippers. He further found that BSA had failed to prove any actual loss. He awarded no damages.

Both parties filed administrative appeals. On October 12, 1979, the ICC division,[5] to which the appeals were taken, reversed the law judge's decision. It approved the abandonment application and found that there had been no violation of the Act by ICG.[6]

The ICC granted petitions to review the matter. Among other procedural steps taken, it reopened the record to receive cost and revenue evidence related to operation of the line in 1975 and 1976. On December 19, 1980, it filed its decision, finding that ICG had not committed the violations charged in BSA's complaint, and that public convenience and necessity permitted abandonment of the 63-mile segment of the line.

1. Rail weights are stated in pounds of steel per linear yard of rail.

2. A "gathering train" connotes the distribution of empty 100-ton cars at various grain elevators along the line, which, when loaded, are gathered into a train for movement as a unit to Gulf ports.

3. The Act was recodified in 1978, without substantive change. For convenience, all references herein to the Act cite the current codification, without citation to the previous placement of the Code of the several provisions.

4. *Abandonment of R. R. Lines & Discontinuance of Service*, 354 I.C.C. 252 (1976).

5. An appellate division consisting of three Commissioners, which is constituted pursuant to the provisions of 49 U.S.C. § 10302.

6. The division found that only about 10% of the available grain traffic was being shipped by rail at the time when the weight limit was reduced on the line, precluding the further use of 100-ton cars. It held that any harm to shippers from abandonment was "clearly" outweighed by the burden upon ICG and interstate commerce from the continuance of service over the line at existing levels.

The ICC first stated that the proper test to be applied when it is alleged that adequate service had been denied to shippers, was the balancing of the public need for service at the level sought by shippers against the burden imposed upon the carrier involved and upon interstate commerce by the providing of service at that level. That inquiry involves a case-by-case approach.[7]

In its consideration of the contention that ICG had not provided adequate service on the line when it discontinued the use of 100-ton cars, ICC found that the line was not designed or constructed to accommodate the gross weight imposed by the use of 100-ton cars; that substantial deterioration of the line had resulted from the limited use of the 100-ton cars; that, although ICG had provided only minimal maintenance of the line, there was no downgrading of the line, because the physical structure would necessarily require that weight limits be imposed which would preclude 100-ton car service; that rehabilitation and maintenance of the line to accommodate 100-ton car service would require that the line be largely reconstructed, using heavier rails and reinforced grading, entailing substantial rehabilitation costs and annual maintenance costs;[8] and that the line could not be profitably operated with 100-ton car service restored without a substantial increase in traffic over and above that generated during the brief period when ICG sought to render that service; that there was no evidence of any possible increase in available traffic which could both offset the substantial rehabilitation and maintenance costs and produce a reasonable prospect of profit; that, although

the nonavailability of 100-ton car rail service would impose some economic burden upon the public in the involved area, there was available alternative transportation for the traffic which previously moved over the line; and that the evidence would not justify an order which would require ICG to provide noncompensatory service by reinstating 100-ton car service. It concluded that ICG had not failed to provide adequate service over the line and that it had not violated Section 11101.

Related to the allegations of undue discrimination against the Bloomer group, the ICC said that the question depends on a case-by-case determination. It said that the line lacked the physical capability to handle 100-ton cars, and thus it differed from other ICG branch lines which possessed that capability, unless it was shown that the lack of capability resulted from the carrier's deliberately downgrading the line. It found that there had been no downgrading of the line, and that the line's physical incapacity to provide the level of service demanded, was a condition which justified ICG's discontinuance of 100-ton service. It concluded that there was no discrimination against BSA shippers and no violation of Section 10741.

Related to the abandonment application, the ICC found that the line could not be profitable if operated under the 210,000-pound weight restriction, and that 100-ton car operations over a reconstructed line would have no reasonable prospect of profitability. It found that abandonment would have little impact on rural and community development in the area served, and that

---

7. The ICC said that *Winnebago Farmers Elevator Co. v. Chicago & Northwestern Transportation Co.*, 354 I.C.C. 859 (1978), could not be construed as establishing a national level of minimum adequate service which is applicable to all branch rail lines.

8. The ICC rejected ICG's engineering cost estimate that reconstruction of the line to accommodate 100-ton cars would cost about $8,000,-000. It adopted a cost estimate by an expert witness of BSA of about $2,000,000 for rehabilitation of the line, by replacing the 75-pound rail as a realistic cost estimate. It appears that the diversion between those estimates lay in the

fact that ICG's estimate proposed the replacement of all 75-pound and 85-pound rail with 115-pound rail, and substantial improvement of the substructure which would befit the line to handle traffic at a maximum speed of 25 miles per hour, while the BSA estimate would replace the 75-pound rail, only, with 90-pound rail, which would limit speed after rehabilitation to 10 miles per hour. The ICC accepted as reasonable a projected rehabilitation cost of about $2,100,000 and a projected maintenance cost of $256,000 annually, following rehabilitation.

any such impact was outweighed by the burden which would be imposed on ICG and interstate commerce if ICG was required to continue operation of the line, with no real prospect of such operation being profitable.

## The Scope of Review

The scope of review of ICC orders is very narrow. The ICC has primary jurisdiction in matters related to application of the Act, *e.g., Great Northern Ry. v. Merchants Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922), which involves the resolution of fact questions and the exercise of discretion in technical matters which are uniquely within the competency of the ICC. Its decision must be sustained if it is supported by substantial evidence and if it is not arbitrary or capricious. 5 U.S.C. § 706(2)(A), (E). The ICC has broad discretion in defining the term "public convenience and necessity" as it applies to the infinite variety of circumstances which may be shown to exist in individual applications for abandonment. *ICC v. Parker*, 326 U.S. 60, 65, 65 S.Ct. 1490, 1492, 89 L.Ed. 2051 (1945). To determine the question of abandonment, the ICC must weigh the interest of persons served by an existing rail line against the interests of the carrier and the transportation system as reflected in the evidence presented to it. *E.g., Chicago & Northwestern Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981); *Purcell v. United States*, 315 U.S. 381, 384, 62 S.Ct. 709, 710, 86 L.Ed. 910 (1942); *Farmland Industries, Inc. v. United States*, 642 F.2d 208, 210–211 (7th Cir. 1981). On review of a decision, the court's function is limited to a determination whether there is warrant in the law and the facts found for the decision reached by the ICC. *United States v. Pierce Auto Freight Lines*, 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946). The weighing of the evidence and the drawing of inferences and conclusions from it are functions of the ICC alone, if it appears that what the ICC has done is supported by substantial evidence. *E.g., Ralston Purina Co. v. Louisville & Nashville Railroad*, 426 U.S. 476, 477–478, 96 S.Ct.

2160, 2161, 48 L.Ed.2d 781 (1976); *Mississippi Public Service Commission v. ICC*, 650 F.2d 551, 553 (5th Cir. 1981); *State of Texas v. United States*, 642 F.2d 87, 90 (5th Cir. 1981).

Substantial evidence is that grade of evidence which will reasonably support a conclusion reached by the ICC, not a preponderant weight of the evidence. Substantiality is not affected by the fact, if it be the fact, that the evidence presented is reasonably susceptible to two or more opposed inferences. *Consolo v. FMC*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). An ICC decision may not be reversed on review if there is a rational connection between the facts found and the choice made. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974).

## Specific Arguments

BSA's challenge to the decision rests largely upon an untenable premise that this court should review the weight of the evidence and, from that review, determine that subsidiary findings which support the abandonment determination by the ICC are erroneous. That premise is wholly inconsistent with the permissible scope of judicial review.

BSA first argues that the ICC determination that the provision of 100-ton car service would burden ICG and interstate commerce, is arbitrary, for the reason that the ICC relied upon excessive rehabilitation figures to support that determination. It argues that the rehabilitation cost must be limited to the $1.2 million cost of replacing the 75-pound rail, and that the balance of cost must be attributed to deliberate downgrading of the line by ICG through deferred maintenance. That argument must be rejected. Substantial evidence does support the findings of the ICC that no deliberate downgrading was shown and that the advanced deterioration of the line was occasioned by the limited provision of 100-ton car service by ICG. Our inquiry must end with that determination.

■ BSA also argues that the ICC findings as to off-branch costs are not supported by substantial evidence. That argument must also fail. ICG employed the methodology required by regulations to compute off-branch costs which were attributable to the line. The ICC stated that those costs were "somewhat overstated," but it found that the costs stated were "substantially correct." BSA argues that the employment of a different methodology, as exemplified by an exhibit produced by BSA, would render substantially lower off-branch cost figures. Since that exhibit was before the ICC, the argument is addressed to the weight, not to the substantiality, of the evidence.

■ BSA next contends that the ICC should have attributed the net revenues from the transportation of certain finished products to the line. Among other products, the line originated shipments of corncobs to manufacturers in Memphis, Tennessee. Those shipments moved under a rate established by ICG for the cob traffic. ICG also handles manufactured products shipped by the Memphis manufacturers under a rate fixed for such transport. There are no transit tariff provisions which link the one shipment to the other. We cannot conclude that there is no rational basis in law for the ICC determination that net revenues from the finished products were not attributable to the line.

■ Finally, BSA argues ICC's finding that it was not shown that any significant additional traffic would move by rail if the line was rebuilt to accommodate 100-ton cars, is not supported by substantial evidence. It is clear, from the argument, that BSA again insists that the evidence be re-weighed and that a contrary finding be directed. That is not the function of this court.[9]

9. In this and in some other contexts, BSA recited findings by the administrative law judge which were opposed to those of the ICC. However, it was the ICC's function to weigh the evidence and to make its findings of fact. It is the ICC decision, not that of the administrative law judge, which is here for review. Even if

For the reasons stated, the decision of the Interstate Commerce Commission is AFFIRMED.

the fact that the ICC opened the hearing for additional evidence be ignored, the most which might be said of a comparison of the findings of the law judge with those of the ICC, is that the evidence admits of two opposed inferences, both of which may be equally substantiated.