**WISCONSIN CENTRAL LTD., Petitioner,**

v.

**SURFACE TRANSPORTATION BOARD and United States of America, Respondents.**

No. 95–3728.

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1996.

Decided April 30, 1997.

---

Thomas J. Litwiler (argued), Oppenheimer, Wolff & Donnelly, Chicago, IL, Janet H. Gilbert, Wisconsin Central Limited, Rosemont, IL, for Petitioner.

Janet Reno, U.S. Attorney General, Washington, DC, John J. Powers, III, John P. Fonte, Department of Justice, Antitrust Division, Appellate Section, Washington, DC, for Respondent U.S.

Henri F. Rush, Interstate Commerce Commission, Office of the General Counsel, Washington, DC, Evelyn Kitay (argued), Surface Transportation Board, Office of the General Counsel, Washington, DC, for Respondent Surface Transportation Board.

Before ESCHBACH, ROVNER, and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Wisconsin Central Ltd. (WCL) seeks review of an order of the now-moribund Interstate Commerce Commission[1] requiring WCL to obtain abandonment authority before it can remove any trackage from a rail line that it purchased in 1987. WCL has never provided common carrier service over that line. It did, however, lease the line to Wisconsin & Michigan Railway Company (WIMI), which provided such service for three years beginning in 1992. It was the view of the ICC (with one member dissenting) that in so doing, WCL held itself out as a common carrier willing and able to provide rail service over the line and thus acquired a common carrier obligation to do so unless and until the ICC relieved it of that obligation. *See Wisconsin & Michigan Ry. Co.—Discontinuance of Service Exemption—In Ashland and Iron Counties, WI and Gogebic County, MI,* Docket No. AB-440X (ICC served May 5, 1995), *petition to partially reopen denied* (ICC served Sept. 21, 1995). We agree with WCL, however, that the mere act of leasing the line to WIMI was insufficient to confer any common carrier obligation on WCL. We therefore grant the petition for review and reverse the ICC's order.

## I.

The rail line at issue in this appeal spans a distance of approximately thirty-two miles between Mellen, Wisconsin and Bessemer, Michigan and is thus known as the Mellen–Bessemer Line. The Soo Line Railroad owned and operated the Line until 1987, when it secured an exemption from the ICC permitting it to abandon the Line. WCL acquired the Mellen–Bessemer Line later that year as part of a larger purchase of more than 2,000 miles of both active and abandoned rail lines from the Soo. In a decision approving WCL's acquisition of the active lines, the ICC noted with respect to the 206.7 miles of abandoned lines that WCL "does not now seek Commission authorization to operate over that abandoned property." *Wisconsin Central Ltd.—Exemption Acquisition and Operation—Certain Lines of Soo Line RR Co.,* Finance Docket No. 31102 (ICC served July 28, 1988), at 1. At no time, in fact, did WCL ever conduct common carrier operations over the Mellen–Bessemer Line or seek the ICC's approval to do so.

In 1991, however, WIMI leased the Mellen–Bessemer Line from WCL with the in-

---

1. Effective January 1, 1996, the Interstate Commerce Commission was abolished in accordance with the "ICC Termination Act of 1995," and the ICC's remaining functions were transferred to the Surface Transportation Board, a newly created agency within the domain of the Department of Transportation. *See* Pub.L.No. 104–88, 109 Stat. 803 (1995). Section 204 of the Termination Act provides that matters arising prior to the effective date of the Act shall be governed by the Interstate Commerce Act as it stood prior to amendment by the Termination Act. 109 Stat. 822–29, 942. This case falls into that category, which explains our reference in this opinion to the former provisions of the Interstate Commerce Act.

tent to provide common carrier service over that Line. After obtaining the lease, WIMI filed a notice with the ICC announcing its intent to renew service on the Line and seeking an exemption from the statutory approval requirements for the initiation of service. WCL was not a party to the ensuing proceeding, and the Commission's decision granting WIMI the exemption did not bestow any operating rights on WCL. On the contrary, the decision observed simply that "WCL purchased the track in 1991[sic], but has not operated it as a line of railroad." *Wisconsin & Michigan Ry. Co.-Operation Exemption—Between Mellen, WI and Bessemer, MI,* Finance Docket No. 31928 (ICC served Sep. 16, 1991), at 1.

WIMI provided service over the Mellen–Bessemer Line beginning in June 1992. The Line did not prove profitable, however,[2] and less than three years later it decided to cease operations. Toward that end, WIMI filed a petition with the ICC seeking an exemption from the statutory approval requirements that would otherwise govern discontinuance of service. R.1; *see* 49 U.S.C. § 10903. No shipper opposed WIMI's request, and on May 5, 1995, the ICC issued an order granting WIMI the exemption that it sought, thus permitting WIMI to terminate service without further proceedings.

WCL was not a party to WIMI's petition, but it did not escape comment in the ICC's May 5 order. Although no one had gone so far as to oppose WIMI's request to discontinue service, the three counties served by the Mellen–Bessemer line had weighed in on the subject. The Boards of Supervisors of Iron and Ashland Counties (Wisconsin) queried whether WCL would retain any residual common carrier obligation once WIMI ended service on the Line, and both expressed the hope that the Line would remain intact. R. 4, 5. The Gogebic County (Michigan) Economic Development Commission and the Gogebic County Board of Commissioners reported that a joint task force had been formed to study present and future need for service on the Line. R. 3, 7. They too in-

quired as to WCL's intent and ability to remove the track. In response to these remarks, WIMI wrote to the Commission to express its understanding that "WCL does not have a common carrier obligation in regard to the rail line and upon grant of an exemption for discontinuance of WIMI's service over the line, WCL can remove the line or sell it outside the provisions of the Interstate Commerce Act, as it chooses." R. 6 at 1–2. But the ICC viewed things differently. In its subsequent opinion granting WIMI the exemption, the Commission observed that "when operations began pursuant to [WIMI's lease from WCL] the line returned to the national rail system." *WIMI I* at 3 n. 5. Moreover:

> WCL still owns the line, and presumably will obtain abandonment authority from the Commission should it decide to remove any track from the Mellen–Bessemer [Line].

*Id.* at 2–3.

Believing that it had no duty to seek the ICC's permission before it removed any trackage from the Line, WCL sought leave to intervene (R. 12) and asked the Commission to reopen the proceeding for the limited purpose of retracting the language suggesting that it did have such an obligation (R. 11). WCL contended that because the Mellen–Bessemer Line had already been abandoned when WCL purchased it from the Soo and because WCL had never provided common carrier service over the Line, WCL was free to remove trackage or otherwise dispose of the Line without the approval of the ICC. The Commission allowed WCL to intervene, but in a voting conference held on August 15, 1996, a majority of the Commission's members voted to deny WCL's request to retract the language in question. The following month, the ICC issued a written decision setting forth its reasons for rejecting the request.

The Commission's refusal to retract the language, and thus to require WCL to seek the Commission's renewed permission to abandon the Line, was based on WCL's deci-

---

**2.** Revenues in 1994, for example, were only $37,155, whereas expenses were $486,500.

R. 1 at 5–6.

sion to lease the line to WIMI for the purpose of providing common carrier service. The Commission acknowledged that once a railroad has been given permission to abandon a line (as the prior owner of the Mellen–Bessemer Line was), "it may consummate the abandonment, remove the track and ties, and convert the real estate to other uses." *WIMI II* at 2. Yet, as the ICC went on to emphasize, the owner of an abandoned line may assume a common carrier obligation bringing it within the Commission's jurisdiction by holding itself out as an entity willing and able to provide rail service to the public. In the Commission's view, this is what WCL had done in leasing the Line to WIMI. It likened the case to *Indiana Hi–Rail Corp., Central Illinois Shippers Inc. and Cisco Corp. Grain Co.—Show Cause,* Finance Docket No. 32422 (ICC served Dec. 29, 1994), in which the Commission had observed:

> When operations began on the [abandoned] line, Cisco [the owner of the line] assumed a residual common carrier obligation.... A person who acquires an abandoned line and then contracts with an agent to provide rail service on the line acquires a residual common carrier obligation.

*WIMI II* at 3 (quoting *Indiana Hi–Rail* at 7). At the same time, it distinguished WCL's case from *Dakota Rail, Inc.—Pet. for Exemption from 49 U.S.C. 10901, 10903 and 11301,* Finance Docket No. 30721 (ICC served Nov. 14, 1985), *pet. to reopen denied* (ICC served Apr. 10, 1986), in which the Commission had held the owner of a rail line under no obligation to continue rail service when its lessee ceased operations on the line. In that case, the ICC pointed out, the owner of the line, Burlington Northern, had insisted that its lessee, Dakota Rail, secure in advance from the Commission an exemption permitting it to both initiate and terminate service over the Line without the approval otherwise required by the Interstate Commerce Act. "BN's insistence on an exemption from Commission regulation as a precondition to the lease can be interpreted as a desire to avoid holding out to provide common carrier service, squaring *Dakota Rail* with other precedent on the ground[ ] that BN did not hold out to provide common

carrier service by leasing the line." *WIMI II* at 3 (footnote omitted). The Commission proceeded to reject WCL's argument that once abandonment authority has been obtained, the owner of the line is shielded from the re-imposition of a common carrier obligation so long as the owner, as opposed to the lessee, manifests no intent to provide service over the line. The expressed intent of the owner is a factor to be considered, the ICC acknowledged, but it is not the sole or decisive factor.

Where the line owner is a railroad, the owner's ability to provide service is apparent from its ownership of the rail line, unless, for example, by its agreement with the operator it has totally and irrevocably surrendered control over the line. Also the owner's willingness to provide rail service may be inferred from the fact that it has leased the line to a railroad intending to provide rail service. Unlike BN in *Dakota Rail,* WCL did not insist on any restrictions on WIMI's holding out to the public when WCL leased the line to that operator.

. . . . .

Shippers rely on the fact that a rail operator must get Commission authority to discontinue service and the owner of a rail line must get authority to abandon the line. If shippers depend on a line that appears to be the same as any other, only to discover that protection against abandonment does not exist, they may, with justification, believe that they have been misled. That is especially so where, as here, the line owner is engaged in the business of providing rail service.

*Id.* at 4. Avoidance of the common carrier obligation that, under this rationale, would normally attach to the owner of an active rail line "should at least be supported by a disclaimer of such an obligation at the time that the line becomes active." *Id.* WCL had made no express disclaimer in leasing the Mellen–Bessemer Line to WIMI, nor could one be inferred from any of WCL's statements or actions. *Id.* Consequently, the Commission concluded that WCL was obligated to seek relief from the residual com-

mon carrier obligation before removing track or disposing of the line.

Vice-Chairman Owen dissented from the Commission's decision. In his view, the record lacked evidence from which one could conclude that WCL held itself out to the public as willing and able to provide service over the Line:

> [T]he criteria used to determine whether or not an entity is a common carrier by railroad is a willingness and an ability to hold itself out to perform rail service to the public. The record is silent on both accounts. By owning the line for over 40 months before contracting with WIMI, however, we can rationally conclude that WCL does not have a willingness to hold itself out to perform rail service to the public. Furthermore, while the majority suggest[s] that the finding of a common carrier obligation here would somehow prevent an injustice to the line's 10 shippers—none of whom opposed WIMI's discontinuance of service—the record is silent as to whether any shipper relied to its detriment on an expectation that WCL had a common carrier obligation that would ensure continued rail service if WIMI discontinued its operations. What the record does establish is that WCL owned the line for over 50 months before WIMI's service commenced, from which a shipper could rationally infer that without a third party provider, such as WIMI, there would not be service over the line. Finally, just because WCL is a railroad it does not necessarily have the ability to perform new, expanded rail service. Again, the record is silent as to whether WCL can perform service over the line.

*Id.* at 4–5.

■ Pursuant to 28 U.S.C. §§ 2321, 2342(5), and 2344, WCL seeks review of the Commission's decision and asks us to reverse.[3]

## II.

■ The Administrative Procedure Act governs our review of the Commission's decision, and in pertinent part it instructs us to consider whether that decision was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). This is a deferential standard of review that precludes us from substituting our own judgment for that of the Commission. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). So long as "the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), and there is "warrant in the law and the facts" for what the ICC has done, *United States v. Pierce Auto Freight Lines,* 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946), we are obligated to sustain the Commission's decision. "However, narrow and deferential review does not equate with no review at all. The inquiry still must be thorough and probing." *Bagdonas v. Department of Treasury,* 93 F.3d 422, 426 (7th Cir.1996) (citing *Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823); *see also, e.g., Pozzie v. United States Dep't of Housing & Urban Dev.,* 48 F.3d 1026, 1029 (7th Cir.1995). Within the range of reason, it is for the Commission, of course, to decide what inferences to draw from the evidence before it and to determine what weight the evidence should be given. *See Ralston Purina Co. v. Louisville & Nashville R.R.,* 426 U.S. 476, 477–78, 96 S.Ct. 2160, 2161, 48 L.Ed.2d 781 (1976) (per curiam); *Bloomer Shippers Ass'n v. ICC,* 679 F.2d 668, 672 (7th Cir.1982). But the Commission's factual findings must have the support of substantial

---

**3.** The Commission's decision to deny a petition to reopen typically is beyond our review when the petition seeks reconsideration based on the same record that was before the Commission in the first instance and offers no new evidence or change in circumstances. *Schneider Nat'l, Inc. v. ICC,* 948 F.2d 338, 344 (7th Cir.1991) (citing 5 U.S.C. § 701(a)(2) and *ICC v. Brotherhood of Locomotive Engineers,* 482 U.S. 270, 282, 107 S.Ct. 2360, 2367, 96 L.Ed.2d 222 (1987)). In

this case, however, WCL was not a party to the exemption request disposed of in *WIMI I,* and thus WCL had no opportunity in the first instance to voice its views as to the residual common carrier obligation that the Commission attributed to WCL in the *WIMI I* decision. For that reason, the parties agree and we find that the Commission's subsequent ruling denying WCL's request to reopen its decision is amenable to review.

evidence in the record, and there must be a rational relationship between the facts as the Commission finds them and its ultimate conclusion. *See Schneider Nat'l, Inc. v. ICC,* 948 F.2d 338, 343 (7th Cir.1991), *Central States Enters., Inc. v. ICC,* 780 F.2d 664, 674 (7th Cir.1985). Questions of law are subject to plenary review, *Illinois v. Shalala,* 4 F.3d 514, 516 (7th Cir.1993); and if the Commission departs from one of its own precedents, it is obligated to articulate a reasoned justification for doing so, *Cross–Sound Ferry Servs., Inc. v. ICC,* 934 F.2d 327, 329 (D.C.Cir.1991); *Consolidated Rail Corp. v. Surface Transp. Bd.,* 93 F.3d 793, 799 (D.C.Cir.1996); *see also Illinois v. ICC,* 722 F.2d 1341, 1348 (7th Cir.1983). Finally, although the Commission's understanding of the scope of its regulatory jurisdiction is entitled to deference, as the Commission itself suggests, *see Oklahoma Natural Gas Co., Div. of ONEOK, Inc. v. FERC,* 28 F.3d 1281, 1283–84 (D.C.Cir.1994); *see also Staten Island Rapid Transit Operating Auth. v. ICC,* 718 F.2d 533, 539 (2d Cir.1983), we remain the final arbiter of the Commission's jurisdiction and authority, as WCL points out. 5 U.S.C. § 706(2)(C); *Illinois Commerce Com'n v. United States,* 779 F.2d 1270, 1271 (7th Cir.1985).

■ Prior to its abolition on January 1, 1996 (*see* n. 1, *supra*) the Interstate Commerce Commission held exclusive authority over virtually all of this country's rail lines. Most relevant for purposes of this appeal was the Commission's power to authorize common carriers to discontinue service and to abandon active rail lines. *See, e.g., Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 319, 101 S.Ct. 1124, 1131, 67 L.Ed.2d 258 (1981). Former 49 U.S.C. § 10903(a) provided that:

A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may—

(1) abandon any part of its railroad lines; or

(2) discontinue the operation of all rail transportation over any part of its railroad lines;

only if the Commission finds that the present or future public convenience and neces-

sity require or permit the abandonment or discontinuance. In making the finding, the Commission shall consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development.

Former 49 U.S.C. § 10505(a), however, gave the ICC the authority to exempt a particular transaction—discontinuance of service, for example—from the provisions of the statute so long as the Commission found the application of such provisions unnecessary to effectuate the rail transportation policy reflected in the former 49 U.S.C. § 10101. It was this authority that the Commission exercised when, in its November 1985 decision, it granted WIMI permission to discontinue service on the Mellen–Bessemer Line without obtaining the prior approval otherwise required by section 10903.

■ In granting the exemption to WIMI, however, the Commission required WCL to seek approval to abandon the Line before removing any trackage or otherwise disposing of the Line; and the essential question before us is whether the Commission had the requisite jurisdiction over WCL and the property underlying the Line to impose that requirement. As the Supreme Court has recognized, "[t]here is an important distinction in the Interstate Commerce Act between 'abandonment' of a rail line and 'discontinuance' of service." *Preseault v. ICC,* 494 U.S. 1, 5 n. 3, 110 S.Ct. 914, 918 n. 3, 108 L.Ed.2d 1 (1990).

Once a carrier "abandons" a rail line pursuant to authority granted by the Interstate Commerce Commission, the line is no longer part of the national transportation system, and although the Commission is empowered to impose conditions on abandonments, as a general proposition ICC jurisdiction terminates. In contrast, "discontinuance" authority allows a railroad to cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service in the future.

*Ibid.* (citations omitted).

There is no dispute that when WCL acquired the Mellen–Bessemer Line from the

Soo, the Line was no longer within the Commission's jurisdiction. The Soo had already obtained the Commission's permission to abandon the Line and had consummated that authority by discontinuing service. At that juncture, then, the Line was simply ordinary real property that WCL was free to transfer or dispose of without Commission approval. *E.g., Common Carrier Status of States, State Agencies & Instrumentalities, & Political Subdivs.,* 363 I.C.C. 132, 135 (1980); *see also Hayfield N. R.R. Co. v. Chicago & N.W. Transp. Co.,* 467 U.S. 622, 633–34, 104 S.Ct. 2610, 2617, 81 L.Ed.2d 527 (1984). WCL later chose to lease the Line to WIMI with the knowledge that WIMI intended to provide service to the public, and in doing so WCL did not disclaim any willingness and ability on its own part to offer service if and when WIMI ceased operations. In the ICC's view, this was enough to bring WCL and the Mellen–Bessemer Line back within the Commission's jurisdiction and to compel WCL to obtain abandonment authority before disposing of the Line.

Few courts have considered the obligations that the owner of an abandoned rail line incurs when it leases the line to an operator that provides service, but the two that have done so both have indicated that the owner takes on no obligation beyond the lease and remains outside the jurisdiction of the Commission. *Meyers v. Famous Realty, Inc.,* 271 F.2d 811, 814–15 (2d Cir.1959), *cert. denied,* 362 U.S. 910, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960); *City of New York v. United States,* 337 F.Supp. 150, 153 (E.D.N.Y.1972) (three-judge court); *see also California v. Southland Royalty Co.,* 436 U.S. 519, 543–44, 98 S.Ct. 1955, 1968, 56 L.Ed.2d 505 (1978) (Stevens, J., dissenting). In *Meyers,* the operator of a leased rail line had received permission from the ICC to cease operations. The plaintiffs went to court seeking an injunction requiring the owners-lessors of the line to provide service on the line until they too were granted abandonment authority by the ICC or until they leased the line to the plaintiffs. The district court dismissed the suit, discerning no ground for imposing such an obligation on the lessors, and the Second Circuit affirmed. The court acknowledged that once a party has attained the status of a

"carrier by railroad" by providing continuous public service over a rail line, it cannot relieve itself of the obligations attendant upon that status—including the obligation to obtain abandonment authority before terminating service—simply by leasing the line to another operator. Rather, once the lessee ceases operations, the duty to provide service reverts to the lessor and remains with it unless and until the Commission grants permission to abandon the line. 271 F.2d at 814. Yet, the court emphasized, a party incurs no obligation to seek abandonment authority unless it has acquired the status of a carrier by railroad, which the lessors in this case had not.

> None of the decisions cited hold or imply that a noncarrier, by merely leasing its properties to a carrier, becomes a "carrier by railroad," thus subjecting itself to an obligation to carry on the operations of its lessee's railroad when said lessee has been granted an abandonment order. We hold that a carrier which leases mere trackage rights to another carrier is under no obligation to carry on that other carrier's operations when its lease expires or that other carrier's operations are legally abandoned. For in such a case the lessor-carrier is not a carrier by railroad with respect to the services performed by its lessee.... As the defendants point out, a contrary holding would lead to the absurd conclusion that one renting a patch of cornfield to a railroad would come under an obligation to operate that railroad if it obtained permission to abandon the operation of its line.

*Id.* at 814–15 (citations omitted). The same principle was reiterated in *New York,* where Judge Friendly noted that the lessor of a rail line bears no independent obligation to provide service that would revive when its lessee discontinues operations "unless the lessor was a 'carrier by railroad' when the lease was made[.]" 337 F.Supp. at 153.

The ICC embraced and expanded upon the same rule in the two decisions that it issued in *Dakota Rail, Inc.—Petition for Exemption from 49 U.S.C. 10901, 10903, and 11301,* Finance Docket No. 30721 (ICC served Nov. 14, 1985), *petition to reopen denied* (ICC

served April 10, 1986), *aff'd. sub nom. Winter v. I.C.C.*, 828 F.2d 1320 (8th Cir.1987). The ICC's decisions in *Dakota Rail* grew out of a local effort to restore service on a 43-mile long abandoned rail line in Minnesota. Burlington Northern (BN) owned the line and at one time had provided common carrier service over the line, but it eventually had received and consummated abandonment authority from the ICC. Hoping to restore service on the line, local shippers formulated a plan under which operator Dakota Rail, Inc. (DRI) would lease the abandoned line from BN for a five-year period for a nominal fee, provide service, and purchase the line outright from BN at the end of the five-year period. BN, however, insisted as a precondition to its obligations under this plan that DRI obtain in advance from the Commission an exemption from the statutory approval requirements to both commence service on the line and discontinue that service prior to the expiration of the five-year lease period. DRI in turn sought the exemption from the Commission, arguing "that the exemption condition is needed to protect BN's interests and to lessen the burden that BN is incurring under the conditional sale arrangement." *Dakota Rail I* at 1.

The Commission proceeded to grant DRI's request, but before turning to the merits of the petition, it made clear that BN's lease of the line to DRI would not burden BN with any need to secure abandonment authority from the Commission once again:

> An *abandonment* exemption is unnecessary since BN has abandoned the line, and as long as it owns the line and does not use it to provide rail service, we no longer have jurisdiction over the right-of-way. Authorizing operations over the property by a non-owning carrier will place the transportation service under our jurisdiction, but will not return the underlying property to Commission jurisdiction. The jurisdictional limits are analogous to operations under trackage rights where the carrier operating under trackage rights has no right to affect the underlying right of way and, consequently, may not "abandon" the right-of-way, but need only seek authority to discontinue service. Once DRI or [its to$formed subsidiary] acquires title to the right-of-way, however, the property and operations will both be subject to Commission jurisdiction. If and when DRI or [its subsidiary] desire to terminate, the Commission's jurisdiction with respect to the property, it will be necessary at that time to obtain authority or an exemption to abandon the line.

*Id.* at 2–3 (emphasis in original).

The Commission reiterated this very point in a subsequent opinion denying a union's petition to reopen the DRI decision. The United Transportation Union (UTU) sought reopening with the hope of securing certain employee protection conditions that the Commission had declined to impose when it approved DRI's exemption request. In its effort to convince the Commission that these conditions were appropriate, UTU made the following two arguments (among others): first, that there had been no bona fide abandonment of the line by BN, because BN had already arranged the lease and eventual sale of the line to DRI before it terminated service and abandoned the line; and second, that in view of the proposed five-year lease arrangement between BN and DRI, which were both rail carriers, BN should be required to resume service on the line in the event that DRI ceased its own operations. *See Dakota Rail II* at 2. The Commission flatly rejected both of these arguments. It pointed out that once BN had been granted permission to abandon the line, BN complied with each of the recognized criteria for abandoning the line. "Thus, BN abandoned the line and there was no need to look at additional indicia to determine whether BN intended to cease permanently all transportation service on the line regardless of the outcome of its simultaneous negotiations to sell the line." *Id.* at 3 (footnote omitted). As a result of the abandonment, "BN ceased being a common carrier on the line; the line ceased being an active line of railroad; and the Commission retained no jurisdiction over the property." *Id.* BN's decision to lease the line to DRI did not, in the Commission's view, restore to BN any duty to provide service in the event DRI's efforts failed:

> ... BN retained no common carrier obligation after abandonment to provide ser-

vice on the line in the event DRI discontinued operations. The cases UTU cited in support of its contrary position are not applicable here. In those cases, the carriers granting the trackage rights did not abandon their lines prior to making agreements for others to operate over them, as BN did in this case. Indeed, since BN has abandoned the line, it may not resume operations without authorization under section 10901. Thus, we have no jurisdiction to require BN to resume operations over this properly abandoned line.

*Id.* at 4.

The plain language of the Commission's decisions in *Dakota Rail* quite clearly appears to foreclose the attribution of any residual common carrier obligation on WCL as the result of its lease to WIMI. There is no dispute, after all, that when WCL acquired the Mellen–Bessemer Line from the Soo, the line properly had been abandoned; and WCL itself neither sought the Commission's approval to provide service to the public over the line nor actually provided such service. It never expressed the intent to do so. WCL, like BN, merely leased the line to another operator that *was* interested and willing to provide service. That act, *Dakota Rail* makes clear, was not enough to bring WCL within the Commission's jurisdiction. In the (modified) words of *Dakota Rail*:

> [A]s long as [WCL] owns the line and does not use it to provide rail service, [the Commission] no longer ha[s] jurisdiction over the right-of-way. Authorizing operations over the property by a non-owning carrier will place the transportation service under [ICC] jurisdiction, but will not return the underlying property to Commission jurisdiction.

*Dakota Rail I* at 2. Imputing a common carrier obligation to WCL as a result of the lease would be inappropriate, because "[WCL] retained no common carrier obligation after abandonment to provide service on the line in the event [WIMI] discontinued operations." *Dakota Rail II* at 4. "Indeed,

since [WCL's predecessor] ha[d] abandoned the line, [WCL] may not resume operations without authorization under section 10901. Thus, [the ICC] ha[s] no jurisdiction to require BN to resume operations over this properly abandoned line." *Id.*

The unequivocal words of *Dakota Rail* notwithstanding, the Commission imposed a residual obligation on WCL on the ground that WCL, unlike BN, had failed to disavow any intent to provide service on the Line in the event WIMI ceased operations. In the absence of such a disclaimer, the Commission reasoned, WCL had in essence held itself out as willing and able to provide service to the public by leasing the Line to WIMI for that very purpose.

But this attempt to distinguish *Dakota Rail* is utterly unconvincing. It is true, as the Commission has pointed out, that when it agreed to lease its line to DRI, BN insisted that DRI secure in advance an exemption permitting it to discontinue service over the line without the need for further approval. And it may be that one can infer from this insistence, as the Commission has done, that BN specifically wished to avoid conveying any erroneous impression that it was prepared to resume service and thereby incurring a residual common carrier obligation. *WIMI II* at 3.[4] But if that was BN's concern, the Commission's decisions in *Dakota Rail* made clear that BN's concern was misplaced. The Commission noted specifically that BN needed no abandonment exemption to protect itself in the event DRI discontinued service. *Dakota Rail I* at 2. Having already abandoned the line, BN was assured, it remained beyond the Commission's jurisdiction so long as it did not provide service. *Id.* So by insisting that WCL have disclaimed any intent to provide service in WIMI's stead, the Commission demands something that its express rationale in *Dakota Rail* deemed unnecessary. As the Eighth Circuit observed in its decision affirming *Dakota Rail*, when a carrier has received and consummated authority to abandon a line,

---

**4.** One might also infer that BN wanted DRI to obtain this exemption in advance so that if service proved economically infeasible and DRI was unable to purchase the line from BN, DRI could

extricate itself quickly and in so doing leave BN free to dispose of the property in some other way.

"the carrier's intent to abandon the line is clear from its regulatory compliance, and thus there is no need for an additional extrinsic finding of intent." *Winter v. ICC*, 828 F.2d 1320, 1323 (8th Cir.1987); *see also Dakota Rail II* at 3.[5] At the same time, when the Commission read into the act of leasing the Mellen–Bessemer Line to WIMI a willingness and an ability on WCL's part to provide service, the Commission drew the very inference that it rejected in *Dakota Rail*. That, after all, was the gist of the UTU's contention—that when BN entered into the lease-purchase relationship with DRI, it took on an obligation to continue service on the line in the event DRI bowed out. Not true, the Commission said. Having previously abandoned the line with the Commission's approval, BN picked up no new obligations with the lease to DRI. "[W]e have no jurisdiction to require BN to resume operations over this properly abandoned line." *Dakota Rail II* at 4.[6]

Apart from their efforts to distinguish *Dakota Rail*, the ICC and now the Board have cited as affirmative support for their position the Commission's decision in *Indiana Hi–Rail Corp., Central Illinois Shippers, Inc. and Cisco Cooperative Grain Co.—Show Cause*, Finance Docket No. 32422 (ICC served Dec. 29, 1994). There, the Cisco Cooperative Grain Company had purchased an

abandoned rail line and hired Indiana Hi–Rail Corporation to operate the line. Because neither Cisco nor Indiana Hi–Rail had obtained the Commission's approval before initiating service, the Commission ordered them to show cause why it should not enter an order directing each of them to comply with the former 49 U.S.C. § 10901, which required a rail carrier to obtain ICC approval before acquiring or operating an "additional railroad line." Upon review of the underlying facts, the Commission made the following observations:

> We find that Indiana Hi–Rail was required to seek Commission authority to operate. Cisco, on the other hand, did not need Commission authority to purchase the abandoned line. When operations began on the line, Cisco assumed a residual common carrier obligation but, under Commission precedent, it did not have to obtain Commission authority.

*Id.* at 7. Although the Board reads *Indiana Hi–Rail* to authorize the residual common-carrier obligation the ICC imposed on WCL, both the Board and the Commission have overlooked a fact that readily distinguishes that case: Cisco (a grain cooperative) *hired* another carrier to provide service, rendering that carrier Cisco's agent. *See Indiana Hi–Rail* at 3–4.[7] WCL, on the other hand, did no such thing—it merely leased the Line to

---

**5.** Here, in contrast to *Dakota Rail*, WCL had not itself received and consummated abandonment authority from the ICC; the line had already been abandoned when WCL purchased it from the Soo. If anything, that distinction leaves WCL in a stronger position, for WCL had never provided service to the public over the Mellen–Bessemer Line.

**6.** The fact that the line had been abandoned prior to the lease distinguishes *Conrail Abandonment in Jeanette, PA*, 366 I.C.C. 384, 387 (1982). There a shipper had acquired a line proposed for abandonment and then contracted with the abandoning carrier to provide service. Faced with that scenario, the Commission treated both the shipper and the operator as common carriers with commensurate obligations under the Interstate Commerce Act. *Cf. Black v. ICC*, 762 F.2d 106, 113–14 (D.C.Cir.1985) (negotiations to sell line that culminated on eve of owner's abandonment raised question as to whether owner truly intended to abandon line even if sale fell through).

**7.** The same appears true in two of the three other cases that the Board has string-cited. *See Southern Elec. Generating Co.—Petition for Exemption—Construction of a Rail Line in Shelby County, AL*, Finance Docket No. 31498 (ICC served Sept. 19, 1989) (utility company proposed construction of rail line over which another carrier would provide service on utility's behalf); *Jackson County Port Authority—Construction Exemption—Pascagoula, MS*, Finance Docket No. 31536 (ICC served Aug. 21, 1990) (port authority proposed construction of rail line to provide access to new port facility; another carrier would provide service).

The third case, *Southern Pacific Transp. Co.—Discontinuance of Service Exemption—in Los Angeles County, CA*, Finance Docket No. AB–12 (Sub. No. 171X) (ICC served Jan. 9, 1995), dealt with requests to discontinue service and abandon an active rail line. Nowhere in that decision did the ICC address whether and to what extent the owner of an abandoned line assumes a common carrier obligation simply by leasing the line to another carrier.

another carrier that was interested in providing service. There is no evidence suggesting that when WIMI commenced service on the Mellen–Bessemer Line, it was acting in any way at WCL's direction or on WCL's behalf. Consequently, the basis for attributing a residual common carrier obligation to the line owner that was present in *Indiana Hi–Rail* is missing here.

We are, quite frankly, puzzled by the emphasis that the Commission and now the Board have placed on WCL's willingness to lease the Mellen–Bessemer Line to WIMI. Virtually as a matter of law, the Commission construed that act as confirmation that WCL was amenable to providing service on its own. *See WIMI II* at 3; Board's Brief at 12, 21. Yet, for all we know, WCL's decision to lease the line was motivated solely by whatever rent WIMI agreed to pay WCL. There is no evidence in the record before us that WCL had any independent desire to see service resumed on the Line. To the contrary, as Vice–Chairman Owen pointed out in his dissent, after purchasing the Line WCL simply let it remain dormant for nearly three and a half years before leasing it to WIMI. Thus, despite whatever *ability* WCL may have had to provide service given its operations as a common carrier on other lines,[8] WCL displayed no *willingness* to provide service on the Mellen–Bessemer Line.

The Board is left with the policy arguments that the Commission articulated in burdening WCL with a common carrier obligation. As the Commission viewed things, shippers know that before a leased rail line may be inactivated and removed from the national rail system, the operator must obtain permission to discontinue service and the owner must obtain abandonment authority. Faced solely with the operator's request to discontinue service, therefore, shippers might assume that if that request is granted, the owner of the line will either have to step in and provide service or request the Commission's permission to abandon the line, even if the owner has previously obtained abandonment authority. This is especially likely, the Commission thought, when the owner of the line is itself a rail carrier. Lulled by the assumption that they will, at the least, have the opportunity to make their views known if and when the owner seeks to abandon the line, shippers might acquiesce in the operator's request to discontinue service, only then to learn that an owner like WCL, whose predecessor in title obtained abandonment authority, is free to dispose of the line as it wishes without further ado. It was thus to avoid misleading shippers that the Commission believed it prudent to require an owner, in the event the operator-lessee discontinues service, to seek the Commission's approval before abandoning the line once again. *WIMI II* at 4.

■ We find the Commission's rationale faulty, for a number of reasons. First, as the cases and the Commission's own decisions in *Dakota Rail* make plain, once a line properly has been abandoned, the line and its owner are beyond the jurisdiction of the Commission. The subsequent lease of the line to an operator who wishes to provide service to the public over that line will of course subject the operator and the service it provides to the Commission's regulatory power, but not the owner and its property. Unless the owner takes some affirmative act beyond the mere lease of the line indicating its willingness and ability to provide service in the lessee's stead, the right of way remains outside the jurisdiction of the Commission. Thus, however prudent the Commission might believe to be the condition it purported to impose on WCL is really beside the point, for the Commission had no power over WCL. Second, the fact that WCL is itself a rail carrier does not make for a different analysis. WCL has never been authorized to provide common carrier service over the Mellen–Bessemer Line, and as the Commission itself has observed, the purchaser of an abandoned line cannot provide service over that line without its approval. *Dakota Rail II* at 4; *see also WIMI II* at 2. Simply because WCL provides service elsewhere is immaterial; insofar as the Mellen–Bessemer Line is concerned, WCL has no more demonstrated a

---

8. As Vice Chairman Owen pointed out, the fact that WCL served the public on other lines by no means established that WCL had the equipment and other resources necessary to commence service on the Mellen–Bessemer Line. *See WIMI II* at 5 (dissent).

willingness and ability to provide service than a non-carrier. WCL should not be treated differently from a real estate company, for example, just because it provides rail service on other lines. Thus we agree with the Second Circuit's holding in *Meyers v. Famous Realty, supra*: "[A] carrier which leases mere trackage rights to another carrier is under no obligation to carry on that other carrier's operations when its lease expires or that other carrier's operations are abandoned. For in such a case the lessor-carrier is not a carrier by railroad with respect to the services performed by its lessee." 271 F.2d at 814–15 (citation omitted); *see Dakota Rail II* at 4. Third, the Commission's thinking attributes contradictory degrees of knowledge and ignorance to the shippers whose interests it purports to protect. On the one hand, shippers are presumed to appreciate that owner and operator do not stand in the same shoes and that permission to the operator to discontinue service on a line does not dispose of the owner's own obligations (if any) with respect to that line. On the other hand, shippers are purportedly unable to appreciate the fact that a line owner has already been granted, and has consummated, permission to abandon the line. Fourth and finally, to the extent that "shippers depend on a line that *appears* to be the same as any other" as the Commission posits, *WIMI II* at 4 (emphasis supplied), we are at a loss to explain why a line owner's disavowal of intent to provide service at the time it leases the line to the operating carrier provides any more notice to shippers than the owner's prior receipt and consummation of authority to abandon the line. Neither affects the line's "appearance" to the public; and insofar as it is appearances that matter, what would seem far more important is that WCL has *never* provided service on the Mellen–Bessemer Line.

### III.

We find that the ICC exceeded its jurisdiction in its decision to deny WCL's motion to reopen and thus to impose an obligation upon WCL to seek the Commission's leave to abandon the Mellen–Bessemer Line (or an exemption from the abandonment requirement). As the owner of an abandoned line,

WCL did not subject itself to the Commission's jurisdiction merely by leasing the line to another carrier that provided service. The Commission was therefore without jurisdiction to impose new obligations upon WCL with respect to the Mellen–Bessemer Line. The rationale advanced by the Commission for the contrary conclusion is, we believe, arbitrary and capricious and contrary to both case law and its own precedent. The petition for review of the Commission's order is GRANTED, and the order is REVERSED.