In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-3586

VILLAGE OF BARRINGTON, ILLINOIS,

*Petitioner*,

*v.*

SURFACE TRANSPORTATION BOARD, *et al.*,

*Respondents*,

*and*

CANADIAN NATIONAL RAILWAY COMPANY, *et al.*,

*Intervening Respondents.*

On Petition for Review of an Order of the
Surface Transportation Board.
STB Finance Docket No. 35087.

ARGUED MAY 22, 2018 — DECIDED JUNE 11, 2018

Before FLAUM and RIPPLE, *Circuit Judges*, and GETTLEMAN, *District Judge*.[*]

___

[*] Of the Northern District of Illinois, sitting by designation.

FLAUM, *Circuit Judge*. In 2007, Canadian National Railway Company ("CN") sought approval from the Surface Transportation Board (the "Board") of its acquisition of control of the Elgin, Joliet, and Eastern Railway Company ("EJ & E") rail line near Chicago. As part of its review, the Board considered the impact of the acquisition on 112 railroad crossings throughout the Chicagoland area, including the intersection at U.S. Highway 14 ("U.S. 14") in the Village of Barrington (the "Village"). Crossings projected to be "substantially affected" by the acquisition were eligible for mitigation measures imposed by the Board as a condition to its approval, up to and including grade separation between the roadway and rail line. The Board approved CN's acquisition in 2008, but determined that U.S. 14 would neither be substantially affected nor warrant a grade separation. The Village unsuccessfully petitioned the Board to reopen its decision in 2011 and 2014. It failed for a third time in 2017, and now appeals the Board's most recent denial. Because the Village does not present new evidence or substantially changed circumstances that mandate a different result, we deny the petition for review.

## I. Background

### A. Factual Background

CN is one of Canada's two major railroads, extending from Halifax, Nova Scotia on the Atlantic coast to Vancouver and Prince Rupert, British Columbia on the Pacific. Through its Grand Trunk Corporation subsidiary, the company also controls numerous rail carriers in the United States. Its American railway system extends north/south from Chicago to the Gulf Coast, and east/west from Pennsylvania to Minnesota.

EJ & E West Company ("EJ & EW") is a wholly owned, noncarrier subsidiary of EJ & E. The EJ & E rail line, located in northeastern Illinois and northwestern Indiana, encompasses a 120-mile arc of mainline track around Chicago.

Beginning in the 1990s, the EJ & E line became a means for freight moving through Chicago to avoid railway congestion in the center of the city. Notably, Chicago is the only city in the United States where all seven Class I railroads (railroads with annual operating revenues of $250 million or more) operate. According to the Board, "one third of all rail freight in the United States moves to, from, or through Chicago," including more than 600 freight trains each day. "Converging in the Chicago Terminal District—a 2,800 mile rail network containing 70 train yards and terminals—these freight trains compete for track and yard space with each other and with over 750 commuter trains and 78 Amtrak trains per day, which together serve over 84 million passengers a year." *Vill. of Barrington v. STB*, 636 F.3d 650, 652 (D.C. Cir. 2011) [hereinafter *Barrington I*]. "The resulting congestion slows freight traffic to a crawl." *Id.*

In 2007, CN sought acquisition of control of EJ & EW in order to move a majority of its Chicago rail traffic to the EJ & E line. At the time, CN's rail network "converge[d] on the city like the spokes of a wheel … meet[ing] in the heart of the Chicago Terminal District." *Id.* As a result, trains passing through the city were forced to "contend with the city's congestion," which often turned the thirty-mile journey into a twenty-four hour endeavor. *Id.* The EJ & E line, however, cut across CN's existing rail lines, thus allowing trains the opportunity to bypass the city center.

Under federal law, the Board "has authority to regulate the construction, operation, and abandonment of most railroad lines in the United States," *Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004), including the "[a]cquisition of control of a rail carrier by any number of rail carriers." 49 U.S.C. § 11323(a)(3).[1] The Board must approve and authorize any transaction "consistent with the public interest," but may nonetheless "impose conditions governing the transaction." *Id.* § 11324(c). CN applied for Board approval on October 30, 2007.

Many roadways that intersect the EJ & E line are important to regional mobility. At the time of the proposed acquisition, "nearly 340,000 people live[d] in close proximity to the EJ & E line," and "73% of road crossings lack[ed] bridges over the tracks." *Barrington I*, 636 F.3d at 653. Consequently, the Board conducted an environmental review in accordance with the National Environmental Policy Act ("NEPA"),[2] 42 U.S.C.

---

[1] The Board is the successor agency to the Interstate Commerce Commission and assumed control on January 1, 1996. *See* 49 U.S.C. § 1302.

[2] The NEPA requires federal agencies to "include in every recommendation or report on … major Federal actions significantly affecting the quality of the human environment, a detailed statement" on:

> (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C).

§§ 4321–4370m-12. The Board's Office of Environmental Analysis ("OEA")[3] prepared an Environmental Impact Statement ("EIS") examining 112 crossings along the EJ & E rail line, including the intersection at U.S. 14 in Barrington. It "studied how increased freight traffic would worsen traffic congestion, increase the risk of collisions, slow emergency responders, and increase the likelihood of hazardous material spills in communities along the rail line." *Barrington I*, 636 F.3d at 668. In the course of preparing the EIS, OEA "publish[ed] notices in the Federal Register and ads in local newspapers, [held] twenty-two public meetings attended by over 7200 people, consult[ed] with local, state, and federal agencies and officials, publish[ed] for comment a 3500 page draft environmental impact statement, [and held] a sixty day comment period on that draft," during which it received over 13,500 comments. *Id.* at 653.

Substantially affected crossings were eligible for the imposition of mitigation measures as a condition to the Board's approval. Possible mitigation measures included: traffic advisory signs that notified drivers to stay clear of intersections; roadway modifications (such as widening); and, most relevant here, grade separation between the roadway and rail line. Critically, however, a substantially affected crossing did not *automatically* warrant mitigation. Rather, in determining what (if any) measures would be appropriate, OEA considered "the individual characteristics of each highway/rail at-grade crossing site." These factors included, *inter alia*, "the importance of the highway at the crossing to regional traffic

---

[3] Portions of the record refer to OEA under its predecessor name, the Section of Environmental Analysis ("SEA"). For consistency, we refer to the entity as OEA throughout this opinion.

flows, existing congestion, existing structures (such as mature trees and local roadways) near the highway/rail at-grade intersection, and the cost of a grade separation."

To determine whether a crossing would be substantially affected by the acquisition, OEA studied impacts on traffic congestion by examining rail and vehicle projections for 2015.[4] Specifically, OEA examined three data "thresholds."[5] The first was the crossing level of service ("LOS"), a measure of how freely traffic moves at a crossing. The LOS at a particular crossing was characterized by a letter from A through F, with "LOS A" indicating relatively free-flowing traffic and "LOS F" indicating extreme congestion. A crossing was declared substantially affected if it would be classified as LOS E or F as a result of the acquisition. Second, OEA examined effects on vehicle queue length, or how far traffic backs up when a train passes. Crossings were deemed substantially affected where acquisition-related queues were projected to block a major thoroughfare that would not otherwise be obstructed. Finally, OEA analyzed the total length of delay for all vehicles stopped at a crossing. Crossings expected to expe-

---

[4] These projections accounted for proposed upgrades to the EJ & E line that were scheduled to be completed before 2015. The Board felt that this "horizon year … represented the limit of what [was] reasonably foreseeable with regard to projected rail traffic on the EJ & E line."

[5] These threshold measurements derived from the Federal Highway Administration's *Railroad-Highway Grade Crossing Handbook*. *See* U.S. Dep't of Transp., Fed. Highway Admin., *Railroad-Highway Grade Crossing Handbook* (2d ed. 2007), https://www.fra.dot.gov/Elib/Details/L02829 (last visited June 4, 2018).

rience more than forty hours of acquisition-related vehicle delay in a twenty-four hour period were considered substantially affected.

OEA's draft EIS projected that if the acquisition were approved, 20.3 CN trains would travel across the Barrington segment of the EJ & E line each day by 2015, with an average length of 6,829 feet and speed of 40 miles per hour. OEA further concluded that U.S. 14 did not exceed any of the three thresholds for substantially affected crossings. In particular, it determined that, as a result of the acquisition, the intersection would: (1) remain at LOS A; (2) not experience queues that blocked a major thoroughfare (although average queue lengths were expected to increase from 558 to 1,048 feet); and (3) encounter only 31.78 hours of daily acquisition-related vehicle delay (compared to 2.49 hours if no CN trains were added).

In response to the draft EIS, the Village conducted its own independent "VISSIM"[6] study using a different methodology than the EIS. The Village claimed that its VISSIM model calculated 135–249 hours of daily acquisition-related vehicle delay at U.S. 14, an amount substantially higher than the draft EIS forecast and above the forty-hour threshold established for substantially affected crossings.

---

[6] "VISSIM" is a German acronym which translated means "traffic in towns—simulation." According to the Village, the model examines "individual driver behaviors and the resulting vehicle interactions to simulate actual traffic flows" and projects train and transit operations "under constraints such as roadway and railway configurations, speed limits, traffic composition, vehicle characteristics, traffic signals, transit stops, train blockages, and driver behaviors."

To address the Village's study, the Board performed an additional VISSIM traffic analysis specifically focused on the Barrington area, referred to as the Village of Barrington Traffic Operational Analysis (the "VOBTOA Study"). The VOBTOA Study concluded that during morning and evening peak periods, overall vehicle delay in the Barrington region would increase by 4% and 5%, respectively. It also found, however, that "the major source of congestion" was not the proposed acquisition, but rather "excess vehicle demand at existing major thoroughfare intersections," which "backs up traffic into significant queues." As a result, it determined that "construction of a grade separation … at … [U.S. 14] … [was] not a feasible way to address regional congestion," and "would only be beneficial if capacity improvements [were] incorporated at the upstream and downstream signalized intersections."

In the final EIS published on December 5, 2008, OEA presented the VOBTOA Study and recommended final mitigation conditions for the proposed acquisition. The final EIS found that thirteen crossings would be substantially affected. Of these, OEA recommended mitigation for eight crossings (including two grade separations); it determined that mitigation was not needed for the remaining five. Once again, however, it concluded that the U.S. 14 intersection did not meet the criteria for a substantially affected crossing, much less a grade separation.

More importantly, the final EIS determined that even if a grade separation at U.S. 14 were constructed, it "would have minimal benefit to traffic flow" because "existing traffic signals in proximity to one another, as well as the [existence of a separate commuter rail line that intersects with the EJ & E line

in Barrington], would result in substantial queuing along … US 14." OEA stated that as a result, "it [was] not the responsibility of [CN] to mitigate for [this] existing traffic congestion in the community by grade separating US 14."

## B. Procedural Background

### 1. *The Board's 2008 Decision*

The Board approved the acquisition on December 24, 2008, subject to CN implementing the environmental mitigation conditions discussed in the final EIS.[7] *See Canadian Nat'l Ry. Co.—Control—EJ & E W. Co.*, STB Finance Docket No. 35087, 2008 WL 8139694 (Dec. 24, 2008). Although the Board recognized that "numerous commenters requested grade separations," it ultimately agreed with OEA's analysis "explaining why a grade separation … would not be practical or warranted at those crossings." Still, it imposed a "monitoring and oversight" period, during which CN was required to submit regular operational and environmental reports and the Board retained the authority to impose additional mitigation measures.[8] CN completed its acquisition of the EJ & E line on January 21, 2009, at a cost of $303 million.

Following the Board's decision, approximately a dozen governmental entities, including the Village, filed petitions

---

[7] The Board ruled that CN would be responsible for 67% and 78.5% of the cost of the two approved grade separations, respectively. Overall, CN has spent over $120 million in voluntary and Board-imposed mitigation measures.

[8] Although this oversight period was originally scheduled to last five years, subsequent decisions of the Board extended it through January 23, 2017.

for review in the D.C. Circuit Court of Appeals. *See Barrington I*, 636 F.3d at 654. The Village argued that the Board "failed to take the requisite 'hard look' at traffic congestion and emergency responder delays in Barrington" and "failed to adequately examine strategies for mitigating those impacts." *Id.* at 672. The D.C. Circuit denied the Village's petition on March 15, 2011. *Id.* at 672–73.

### 2. *The 2011 Petition to Reopen*[9]

On October 14, 2011, the Village petitioned the Board to reopen its 2008 decision and require CN to bear at least 84% of the cost of a grade separation at U.S. 14. In relevant part, the Village highlighted that the Illinois Department of Transportation ("IDOT") had designated U.S. 14 a Strategic Regional Arterial ("SRA").[10] It also submitted an updated version of its 2008 VISSIM study. The revised analysis projected

---

[9] Between the Board's 2008 decision and the Village's 2011 petition to reopen, the Board commissioned a third-party audit of CN's operational and environmental reports, based upon allegations that the company was underreporting the number of crossing blockages lasting for ten minutes or more. In 2010, the Board found that CN had knowingly underreported the number of blocked crossings and issued a $250,000 fine against the carrier. *See Canadian Nat'l Ry. Co.—Control—EJ & E W. Co.*, (Decision No. 27), STB Finance Docket No. 35087 (Dec. 21, 2010). The Board also extended the scheduled oversight period one year and directed CN to provide additional information in its reports regarding crossing blockages. *See Canadian Nat'l Ry. Co.—Control—EJ & E W. Co.*, (Decision No. 26), STB Finance Docket No. 35087 (Dec. 21, 2010).

[10] The SRA system "is intended to carry larger volumes of traffic at higher speeds as a complement to the region's expressway system. Efforts are made to preserve the level of service on these roadways through appropriate access and traffic signal locations and spacing." *Strategic Regional Arterial Resources*, Chicago Metropolitan Agency for Planning (July

2015 traffic conditions by examining actual post-acquisition CN operations in mid-2011 rather than the pre-acquisition estimates created in 2008. This time, the Village's study predicted 98–100 hours of acquisition-related vehicle delay at U.S. 14. As in 2008, the Village argued that this projection satisfied one of the criteria used by the Board in determining substantially affected crossings. However, the Village's study also indicated that, even if CN trains were *not* added to the EJ & E line, vehicle delay in 2015 would increase by 260 hours compared to 2007 levels.

In addition, the Village introduced evidence that in 2010, it received a $2.8 million federal grant under the Transportation Investment Generating Economic Recovery ("TIGER II") program to undertake preliminary engineering studies for a grade separation at U.S. 14. It argued that its receipt of the TIGER II grant showed that the Board erred in not ordering a grade separation in 2008. Finally, it cited a growing "industry trend" of increased train lengths and slower train speeds, which it argued the Board did not consider when developing its 2008 mitigation framework.

The Board denied the Village's petition on November 8, 2012. *See Canadian Nat'l Ry. Co.—Control—EJ & E W. Co.*, STB Finance Docket No. 35087, 2012 WL 5458828 (Nov. 8, 2012). It concluded that "SRA designation alone … did not warrant a grade separation at a given intersection, particularly in areas with preexisting roadway capacity constraints." It further found that because the Village's 2011 study projected *less* impact on vehicle delay than its 2008 analysis, the Village had

---

16, 2013), http://www.cmap.illinois.gov/data/transportation/traffic/sra-re-sources.

not presented new evidence or changed circumstances that would have materially altered its 2008 decision. It also noted that the Village's study confirmed that "even if CN's additional trains were to add 98–100 hours of increased vehicle delay at U.S. 14 … existing capacity constraints on U.S. 14 will contribute much more significantly to the vehicle delays at that crossing than will additional CN trains on the EJ & E line."

Additionally, the Board reiterated that "exceeding the 40-hour traffic delay threshold did not automatically warrant … a grade separation." As evidence, it pointed to the five crossings deemed substantially affected in 2008 that ultimately did not receive *any* mitigation measures. Citing the VOBTOA Study and final EIS, the Board emphasized that while the acquisition would increase delay at U.S. 14 "to some degree," it "would not substantially modify the basic nature of the traffic congestion that motorists were already experiencing and would continue to experience in Barrington due to preexisting roadway capacity constraints."

Regarding the TIGER II grant, the Board stated that the Village did not cite "any statements relating to the awarding of the grant that refute[d] the Board's decision in the [2008] Final Decision not to impose a grade separation." Last, it found that the Village failed to show that its supposed "industry trends" involving train length and speed "appl[ied] to or reflect[ed] CN's operations on the EJ & E rail line."

Once again, the Village filed a petition for review, which the D.C. Circuit denied on July 18, 2014. *Vill. of Barrington v. STB*, 758 F.3d 326 (D.C. Cir. 2014) [hereinafter *Barrington II*].

### 3. *The 2014 Petition to Reopen*

The Village filed another petition with the Board on November 26, 2014, this time asking that CN be forced to contribute 79% of the cost of a grade separation (equal to $47 million). The Village referenced unexpected "energy-related market developments on CN's rail network." Specifically, it claimed that the acquisition, combined with an unexpected rise in global energy prices, had "facilitated … increased movement of energy commodity traffic (namely, crude oil, ethanol, and frac sand shipments) and that these unforeseen traffic volumes were not factored in the projections relied upon by the Board in its 2008 Final Decision." It asserted that "it necessarily follow[ed] that CN's projections could not have allowed the Board to weigh the profound long-term impact … on Barrington." It also maintained that this energy-related traffic resulted in "unanticipated movement of flammable hazardous materials through Barrington [that] pose[d] a threat to public safety not previously considered by the Board."

Additionally, the Village contended that the average length of CN trains had significantly increased (from 5,800 feet in 2011 to 8,568 feet in 2014). It stated that this created greater vehicles delays and threatened emergency medical response. It also raised the prospect of "double-tracking," i.e., the addition of a second parallel track along the EJ & E line. It claimed that, based upon the increase in energy-related freight traffic, as well as emails sent by CN personnel in 2013, "it [was] only a matter of time before CN [would] double track through Barrington" in order to maximize its transportation capabilities.

Finally, the Village reemphasized its receipt of the federal TIGER II grant, and added that it had since received an additional $700,000 local match from IDOT. As in 2011, it argued that this funding "reflect[ed] the federal government's determination that a grade separation at the U.S. Highway 14 crossing [was] essential."

The Board denied the Village's petition on May 15, 2015. *See Canadian Nat'l Ry. Co.—Control—EJ & E W. Co.*, STB Finance Docket No. 35087, 2015 WL 2339001 (May 15, 2015). The Board found that, contrary to the Village's assertions, traffic volumes on the EJ & E line were actually *lower* than levels projected in 2008, even when anticipated future growth in energy-related traffic was considered.[11] Thus, it concluded that its 2008 decision "did in fact consider the impacts of rail line operations in Barrington at the traffic levels that are moving through Barrington today and are expected in the near term." It also highlighted that the final EIS recognized "that increases in freight rail traffic on the EJ & E line would also increase the risk of adverse hazardous materials incidents," but nonetheless concluded that the acquisition "[did] not create any new threats" because "a variety of hazardous materials, including flammable liquids, already moved over the line pre-transaction."

Regarding the length of trains, the Board stated that the Village's cited figure "[did] not offer a complete account of

---

[11] Recall that in 2008, the EIS projected that U.S. 14 would experience an average of 20.3 trains per day in 2015. According to CN's operational reports, the actual number of trains in 2014 averaged only 17.5 per day. CN anticipated that future growth in energy-related traffic would only increase this number by an additional 2.5 trains per day, still below the 2008 projection.

rail traffic" because it only analyzed trains that blocked crossings for more than ten minutes. In reality, the average train length was only 6,916 feet, which was "not substantially greater" than the 6,829 feet projected by the Board in 2008.

The Board further echoed that, regardless of the potential change in circumstances, a substantially affected crossing "did not automatically warrant mitigation." Rather, "[a] host of other factors … went into determining whether any mitigation was appropriate for a 'substantially affected' crossing," including "preexisting congestion." It restated that the final EIS determined that a grade separation at U.S. 14 "would provide minimal benefit to the traffic flow in the Barrington area, primarily due to preexisting roadway capacity constraints near U.S. 14." As a result, "[i]n keeping with its practice of mitigating only impacts resulting directly from the transaction and not requiring mitigation for preexisting conditions … the Board concluded that the U.S. 14 intersection … did not meet the Board's criteria for a grade-separated crossing." It found that the Village failed to present new evidence that would alter this determination.

The Village filed a petition for reconsideration of the Board's decision, which the Board denied on November 4, 2015. *See Canadian Nat'l Ry. Co.—Control—EJ & E W. Co.*, STB Finance Docket No. 35087, 2015 WL 6749916 (Nov. 4, 2015). The Board found that a majority of the Village's reconsideration claims were "simply restatements of prior arguments." As a result, the Village's "repeated arguments regarding grade-separation mitigation at U.S. 14 [did] not provide sufficient basis for reconsideration." The Village did not seek judicial review.

### 4. *The 2017 Petition to Reopen*

On January 10, 2017, the Village, this time joined by IDOT, once again petitioned the Board to require CN to pay 58% of the cost of a grade separation (equal to $37.5 million). The Village asserted that its renewed request was based upon "unanticipated new evidence of substantially changed circumstances regarding CN's operations and the impacts throughout the region." It reiterated U.S. 14's designation as an SRA, as well as its receipt of federal and state grant funding. Additionally, it predicted that an anticipated increase in annual capacity of the Fairview Terminal at the Port of Prince Rupert ("PPR") in British Columbia, Canada would increase future CN freight traffic moving through Chicago. It also repeated that CN was actively planning to double-track the Barrington portion of the EJ & E line. Finally, it stated that during three months in 2016, the average length of trains had grown to 7,800 feet, their average speed had fallen to 28 miles per hour, and the number of hazmat cars had risen to over 400 per day. It asserted that these increased figures led to more blockages of U.S. 14.

The Board denied the petition on April 26, 2017, finding that the Village "[did] not present new evidence or substantially changed circumstances that warrant[ed] reopening [the] proceeding." *See Canadian Nat'l Ry. Co.—Control—EJ & E W. Co.*, STB Finance Docket No. 35087, 2017 WL 1509296 (Apr. 26, 2017). After outlining the case's extensive procedural history, the Board noted that "the traffic volumes on the EJ & E line have been and continue to be lower than the projected levels relied upon by the Board in its 2008 Final Decision." According to CN's operational reports, U.S. 14 averaged only 19.6

trains per day in 2015 and 18.1 trains per day in 2016, both below the 20.3 trains per day originally projected in 2008.

The Board further found that the Village failed to provide "persuasive evidence to support their claim that a significant increase in rail traffic … [was] imminent." Citing verified statements submitted by senior CN executives, it stated that the purported PPR expansion, if completed, would result in only 0.5 additional trains per day traveling through Barrington. It also accepted CN's assurance that it had "no need and no current plans to double-track the line" over U.S. 14. Additionally, it noted that, even if CN's traffic volumes *did* increase in the future, it was unlikely "that any such increases would be attributable to [the acquisition], which was approved over eight years ago." Rather, "a variety of other factors unrelated to the transaction, such as changes in the industry, economic growth, and energy prices, [were] now just as likely to play a role in future fluctuations in rail traffic."

Although the Board acknowledged that CN trains were marginally longer and slower than originally projected, it explained that this could actually *reduce* overall crossing activation times, because "the amount of time a crossing is activated before and after the arrival of each train is fixed, regardless of train length." It further noted that CN's train speeds were reduced as an added safety precaution and that the U.S. 14 intersection averaged less than one reportable blocked crossing each month in 2016. It also adopted CN's claim that because a commuter line with priority over CN's traffic also crosses the EJ & E line in Barrington, "the windows available to CN to move its traffic through Barrington generally are short." As a result, "CN paces its trains to get past the Barrington crossings and, if necessary, hold them outside the Barrington

area." According to the Board, these "operational reasons" made it unlikely that blockages would increase in the future.

Finally, the Board observed that, contrary to the Village's estimates, the average number of hazmat cars in 2016 (254, 127 of which were actually loaded) was only slightly higher than the 209.4 projected by the Board in 2008. Moreover, it cited multiple federal agencies (including the Federal Railroad Administration, the Transportation Security Administration, and the Pipeline and Hazardous Materials Safety Administration) with established regulations for the transport of hazardous material by rail "which, along with the mitigation measures imposed in the 2008 Final Decision, should appropriately minimize the safety risks."

In sum, the Board concluded that, on the whole, the Village's new complaints "would [not] warrant a different result under the criteria relied upon by the Board in 2008."

On May 16, 2017, the Village filed a petition for reconsideration. This time, the Village argued that the Board's determination—originally reached in 2008—that the traffic issues at the U.S. 14 intersection were primarily the result of preexisting conditions constituted material error. As evidence, it cited: (1) the Board's own EIS projections that U.S. 14 would experience only 2.49 hours of delay without CN's acquisition, compared to 31.78 hours of delay once the transaction was taken into account; (2) the VOBTOA Study's conclusion that total vehicle delay time in the Barrington region would increase by 4% and 5% during morning and evening peak periods following the acquisition; and (3) the Village's VISSIM studies from 2008 and 2011.

The Village also proffered new evidence (based upon extrapolations of its 2011 study using data from 2015 and 2016) that annual delay at the U.S. 14 intersection had reached 118 hours in the spring of 2016. It believed this information "demonstrate[d] that U.S. 14 experiences vehicular traffic delay that exceeds the 40-hour threshold criterion for a 'substantially affected' crossing" and therefore required a grade separation.

The Board denied the Village's petition for reconsideration on October 30, 2017. *See Canadian Nat'l Ry. Co.—Control—EJ & E W. Co.*, STB Finance Docket No. 35087, 2017 WL 5639664 (Oct. 30, 2017). Regarding the Village's claims of material error, the Board stated that the EIS's thirty-hour delay prediction was "consistent with the Board's determination that U.S. 14 was not a 'substantially affected' crossing." Additionally, it highlighted the VOBTOA Study's finding that "[a]lthough … peak period queue lengths [at U.S. 14] would increase, … such increases were primarily caused by high traffic volumes and a preexisting lack of capacity at the intersection of … U.S. 14, rather than by the [acquisition]." This conclusion was buttressed by the Village's own traffic studies, which "showed that preexisting capacity constraints in the Barrington street network would contribute much more significantly to the vehicle delays at [the U.S. 14 crossing] than would additional CN trains on the EJ & E line."

The Board similarly rejected the Village's proffered "new evidence" of increased vehicle delay. It first noted that the 2015 and 2016 data sets used by the Village to conduct its extrapolation were available before it filed its original January 2017 petition. Moreover, the underlying calculations were performed in February 2017, prior to the announcement of the

Board's April 26, 2017 decision. The Board found that "[b]ecause the data was readily available to Barrington when the record was developed," the calculations did not constitute "new evidence."

Regardless, the Board stated that even if the Village's projections were considered, they "would not change the outcome of the Board's previous decisions." It highlighted that the Village's revised delay projection was still lower than the estimates provided in their original 2008 traffic study, "the conclusions of which were already before the Board when it issued its 2008 Final Decision." Furthermore, it reaffirmed that "exceeding a certain level of vehicle delay at a crossing did not automatically warrant mitigation under the Board's criteria," but rather was "only one factor in determining if a crossing was eligible for mitigation." It stood by its longstanding view that "a grade separation at U.S. 14 [was] not warranted because Barrington's vehicle delays were primarily attributable to preexisting traffic conditions and capacity constraints." Accordingly, "Barrington's evidence, even if it were timely, would not have altered the outcome the Board previously reached." This appeal followed.[12]

## II.    Discussion

### A. The Specific Order at Issue

As a preliminary matter, we must establish the precise Board decision subject to judicial scrutiny. Under Federal

---

[12] The Village's January 10, 2017 petition also sought extension of the Board's oversight period until January 9, 2019. This request was denied by the Board in its April 26, 2017 decision. The Village did not request reconsideration of this aspect of the Board's decision, and it is not at issue in this appeal.

Rule of Appellate Procedure 15, a petition for review must "specify the order or part thereof to be reviewed." Fed. R. App. P. 15(a)(2)(C). Similarly, 28 U.S.C. § 2344 requires a petitioner to "attach to the petition, as exhibits, copies of the order, report, or decision of the agency." "Failure to specify the correct order can result in dismissal of the petition." *Entravision Holdings, LLC v. FCC*, 202 F.3d 311, 312 (D.C. Cir. 2000); *see also City of Benton v. Nuclear Reg Comm'n*, 136 F.3d 824, 826 (D.C. Cir. 1998); *John D. Copanos & Sons, Inc. v. FDA*, 854 F.2d 510, 527 (D.C. Cir. 1988). On the other hand:

> A mistaken or inexact specification of the order to be reviewed will not be fatal to the petition … if the petitioner's intent to seek review of a specific order can be fairly inferred from the petition for review or from other contemporaneous filings, and the respondent is not misled by the mistake.

*Entravision*, 202 F.3d at 313; *compare Martin v. FERC*, 199 F.3d 1370, 1371–73 (D.C. Cir. 2000) (finding that petitioner's intent to seek review of different agency decision than order specified in petition for review could be fairly inferred from contemporaneous filings and that respondent was not prejudiced), *and Damsky v. FCC*, 199 F.3d 527, 532–34 (D.C. Cir. 2000) (same), *with Sw. Bell Tel. Co. v. FCC*, 180 F.3d 307, 313 (D.C. Cir. 1999) (finding that petitioner's intent to seek review was not fairly inferable from petition of review or subsequent filings), *and Brookens v. White*, 795 F.2d 178, 180 (D.C. Cir. 1986) (similar).

Respondents argue that we should dismiss the Village's arguments to the extent they concern the Board's April 26, 2017 order (or other prior decisions). Their point is well taken. The D.C. Circuit's decision in *Entravision* is instructive. There,

the petitioner submitted comments to the Federal Communications Commission ("FCC") suggesting that certain protections be granted to stations that would be displaced by a proposed relocation of broadcast television channels. *Entravision*, 202 F.3d at 312. In a "Report and Order," the FCC adopted the reallocation proposal but declined to adopt the recommended protections. *Id.* The petitioner then filed a petition for partial reconsideration that was subsequently denied in a "Memorandum Opinion & Order." *Id.* On appeal, the D.C. Circuit held that only the Memorandum Opinion & Order was at issue because that was the order specified in, and attached to, the petition for review. *Id.* at 314. Although the Report and Order was briefly mentioned, it was "only in the course of stating the history of the proceeding prior to the order of which review [was] being sought." *Id.* Moreover, the petitioner's docketing statement and preliminary statement of issues only specified the Memorandum Opinion & Order. *Id.* As a result, the court concluded that the petitioner "ha[d] not brought the Report & Order before [the] court for review." *Id.* (emphasis removed).

The same reasoning applies here. Although the Village's appellate brief levels numerous attacks at the Board's April 26, 2017 decision denying the Village's January 10, 2017 petition to reopen, its Petition for Review only requests examination of the Board's October 30, 2017 order denying the Village's May 16, 2017 petition for reconsideration. Specifically, the Village requests that we "review … the decision, dated October 30, 2017," and "set aside the October 2017 Decision and remand this case to the Board." Furthermore, the Village attached only the October 30, 2017 decision to its petition, and the jurisdictional statement of the Village's opening brief

states that "[t]his case involves judicial review of the final order of the [Board], dated October 30, 2017."

Nevertheless, in the interest of completeness, we address the Village's claims pertaining to *both* its January 10, 2017 petition *and* May 16, 2017 petition for reconsideration. As outlined *infra*, this expanded review does not alter our ultimate conclusion, as none of the Village's claims in either petition warrant judicial relief.

Both petitions requested that the Board reopen its original 2008 decision and impose additional mitigation measures. By statute, the Board may "reopen a proceeding" and "change an action of the Board" based upon: (1) "material error"; (2) "new evidence"; or (3) "substantially changed circumstances." 49 U.S.C. § 1322(c); *see also* 49 C.F.R. § 1115.4. Notably, regardless of the avenue pursued, the alleged grounds must be sufficient to lead the Board to materially alter its prior decision. If a party has presented no material error, new evidence, or changed circumstances "that would mandate a different result," then the Board need not reopen its proceedings. *See Montezuma Grain Co., LLP v. STB*, 339 F.3d 535, 542 (7th Cir. 2003). The Village argues that all three categories are applicable here.

### B. Material Error

First, the Village's claims of material error fall outside our jurisdiction. *Barrington II*, 758 F.3d at 328. In *ICC v. Brotherhood of Locomotive Engineers*, the Supreme Court held that "where a party petitions an agency for reconsideration on the ground of 'material error,' *i.e.*, on the same record that was before the agency when it rendered its original decision, 'an order which

merely denies rehearing of ... [the prior] order is not itself reviewable.'" 482 U.S. 270, 280 (1987) [hereinafter *BLE*] (alteration in original) (quoting *Microwave Commc'ns, Inc. v. FCC*, 515 F.2d 385, 387 n.7 (D.C. Cir. 1974)). This is true even where, as here, "the agency 'order refusing reconsideration discusse[s] the merits of the [petitioner's] claims at length,' as long as the agency's 'formal disposition is to deny reconsideration, and … it makes no alteration in the underlying order.'" *Barrington II*, 758 F.3d at 328 (alterations added) (quoting *BLE*, 482 U.S. at 280); *see also U.S. Postal Serv. v. Postal Regulatory Comm'n*, 841 F.3d 509, 513 (D.C. Cir. 2016) ("Simply discussing the merits of an earlier agency decision does not open a reconsideration denial to review.").

Both the Board's April 26 and October 30, 2017 orders denied reopening its 2008 decision. "Accordingly, there is nothing more we can say about Barrington's claims of material error." *See Barrington II*, 758 F.3d at 328; *see also Schneider Nat'l, Inc. v. ICC*, 948 F.2d 338, 344 (7th Cir. 1991); *Advance Transp. Co. v. United States*, 884 F.2d 303, 305 (7th Cir. 1989); *Town of Springfield v. STB*, 412 F.3d 187, 189 (D.C. Cir. 2005) ("[W]hen a reopening petition rested on 'material error,' the court has no jurisdiction to review a denial of the petition."); *Schoenbohm v. FCC*, 204 F.3d 243, 245 (D.C. Cir. 2000) ("Denial of a petition for reconsideration … is generally nonreviewable unless the request for reconsideration was based on new evidence or changed circumstances."). We therefore dismiss the material error arguments interspersed throughout the Village's pleadings.

### C. New Evidence and Substantially Changed Circumstances

Judicial review *is* available "[i]f the petition that was denied sought reopening on the basis of new evidence or changed circumstances." *BLE*, 482 U.S. at 284. Even in this context, however, "[o]ur review of a decision by the Board is narrow." *Decatur Cty. Comm'rs v. STB*, 308 F.3d 710, 714 (7th Cir. 2002). The Board is not required to reopen proceedings simply because a petition presents new evidence or changed circumstances. *See Jost v. STB*, 194 F.3d 79, 85 (D.C. Cir. 1999). Thus, "overturning the refusal to reopen requires 'a showing of the clearest abuse of discretion.'" *BLE*, 482 U.S. at 278 (quoting *United States v. Pierce Auto Freight Lines*, 327 U.S. 515, 535 (1946)).

"The Administrative Procedure Act governs our review of the [Board's] decision, and in pertinent part it instructs us to consider whether that decision was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law." *Wis. Cent. Ltd. v. STB*, 112 F.3d 881, 886 (7th Cir. 1997) (citing 5 U.S.C. § 706(2)(A)). "This is a deferential standard of review that precludes us from substituting our own judgment for that of the [Board]." *Id.*; *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins.*, 463 U.S. 29, 43 (1983) ("[A] court is not to substitute its judgment for that of the agency."). "A decision is not arbitrary or capricious when it is possible to offer a reasoned, evidence-based explanation for a particular outcome." *R.R. Ventures, Inc. v. STB*, 299 F.3d 523, 548 (6th Cir. 2002). "If an agency considers the proper factors and makes a factual determination" that a particular result is compelled, "that decision implicates substantial agency expertise and is entitled

to deference." *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 953 (7th Cir. 2003).

Such deference is particularly owed in cases involving the imposition of protective conditions on railroad acquisitions, where "the Board 'has extraordinarily broad discretion.'" *Commuter Rail Div. of Reg'l Transp. Auth. v. STB*, 608 F.3d 24, 31 (D.C. Cir. 2010) (quoting *Grainbelt Corp. v. STB*, 109 F.3d 794, 798 (D.C. Cir. 1997)). We afford "great deference to the [Board's] selection of such conditions," and we "will deny a petition for review so long as the [Board's] decision is supported by substantial evidence in the record and was reached by reasoned decision-making." *Id.* (alterations in original) (quotation marks omitted) (quoting *Grainbelt*, 109 F.3d at 798–99). "So long as 'the agency's path may reasonably be discerned' and there is 'warrant in the law and the facts' for what the [Board] has done, we are obligated to sustain the [Board's] decision." *Wis. Cent.*, 112 F.3d at 886 (first quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974), then quoting *Pierce Auto*, 327 U.S. at 536).

At the same time, "narrow and deferential review does not equate with no review at all. The inquiry still must be thorough and probing." *Id.* (quoting *Bagdonas v. Dep't of Treasury*, 93 F.3d 422, 426 (7th Cir. 1996)). "Within the range of reason, it is for the [Board], of course, to decide what inferences to draw from the evidence before it and to determine what weight the evidence should be given." *Id.* "But the [Board's] factual findings must have the support of substantial evidence in the record, and there must be a rational relationship between the facts as the [Board] finds them and its ultimate conclusion." *Id.* at 886–87. Meanwhile, "[q]uestions of law are subject to plenary review, and if the [Board] departs from one

of its own precedents, it is obligated to articulate a reasoned justification for doing so." *Id.* at 887 (citations omitted). "Finally, although the [Board's] understanding of the scope of its regulatory jurisdiction is entitled to deference, … we remain the final arbiter of the [Board's] jurisdiction and authority …." *Id.* (citations omitted).

One final point warrants discussion. "[I]n an administratively final case it is only fair that new evidence be in fact *new.*" *Friends of Sierra R.R. v. ICC*, 881 F.2d 663, 667 (9th Cir. 1989) (quoting *Platnick Bros., Inc. v. Norfolk & W. Ry. Co.*, 367 I.C.C. 782, 785 (1983) (internal quotations omitted)). Section 1322(c) does not define "new evidence," but courts have definitively said what it is *not*. First, new evidence is not the same as "*newly raised* evidence." *Id.* That is, new evidence is "facts which through no fault of [the petitioner's], the original proceeding did not contain." *Jost*, 194 F.3d at 84 (alteration in original) (quoting *Sw. Bell*, 180 F.3d at 312); *see also Toledo, Peoria & W. Ry v. STB*, 462 F.3d 734, 753 (7th Cir. 2006) ("[T]he term new evidence refers to evidence that was not reasonably available to the party when the record was developed, and not simply newly raised." (internal quotation marks omitted) (quoting *Tex. Mun. Power Agency v. Burlington N. & Sante Fe R.R. Co.*, STB Docket No. 42056, 2004 WL 2619767, at *2 (Sept. 27, 2004))). "Thus, evidence that was reasonably available to the parties before the proceeding is not new evidence for purposes of the statute." *Friends of Sierra*, 881 F.2d at 667 (quoting *Platnick Bros.*, 367 I.C.C. at 785); *see also Toledo*, 462 F.3d at 753 ("[T]he Board generally does not consider new issues raised for the first time on reconsideration where those issues could have and should have been presented in the earlier stages of the proceeding." (alteration in original) (quoting *Tex. Mun. Power Agency*, 2004 WL 2619767, at *2)). Second, new evidence

does more than simply provide "new insight on the significance of the existing record evidence." *Berry v. U.S. Dep't of Labor*, 832 F.3d 627, 638 (6th Cir. 2016).

Here, a close review of the record reveals that most of the arguments in the Village's 2017 petitions merely rehash those previously raised—and rejected—during the ten-year lifespan of this proceeding. Meanwhile, the few claims that arguably fall outside this category do not compel an alternate result. We address each in turn.

### 1. *Designation of U.S. 14 as an SRA*

The Village contends that the Board's 2017 decisions improperly ignored U.S. 14's status as an SRA. This is not new evidence. IDOT labeled U.S. 14 as an SRA as early as 1993. Indeed, the Village specifically referenced the designation in its 2011 petition, more than five years before the filing of its 2017 petition to reopen. At that time, the Board concluded that "SRA designation alone … did not warrant a grade separation at a given intersection, particularly in areas with preexisting roadway constraints." Therefore, the Board did not abuse its discretion in declining to reopen its 2008 decision on that basis.

### 2. *Receipt of Federal and State Funding*

The Village argues that the importance of U.S. 14 to regional traffic mobility is underscored by Barrington's receipt of its federal TIGER II grant and local match from IDOT. However, the TIGER II grant was awarded on October 15, 2010, and the Village referenced its receipt of government funding in both its 2011 and 2014 petitions. At that time, the Board determined that the grants did not "refute the Board's

decision" to not impose a grade separation. They accordingly do not constitute new evidence.

     *3.  Crude-By-Rail and Hazardous Material Traffic Increases*

The Village claims that during the oversight period, "unforeseen 'crude-by-rail' traffic has substantially increased the amount of highly flammable hazmat that CN had originally projected would move through Barrington." The Village believes this increase "threaten[s] emergency responders' ability to respond to a potentially catastrophic disaster if a train transporting multiple cars of highly flammable crude oil were to derail and catch fire." However, the Village presented the exact same concern in 2014, when energy-related rail traffic was even higher than in 2017. At that time, the Board found that the acquisition "[did] not create any new threats" because hazardous materials moved over the EJ & E line even before CN's acquisition. As a result, it does not qualify as new evidence. Regardless, the Village's fears are overstated. In 2008, the Board projected that by 2015, 209.4 hazmat cars would move across the EJ & E line each day. According to CN, the actual number in 2016 was only slightly higher (254, only 127 of which were actually loaded). Therefore, the Board did not abuse its discretion in declining to reopen its 2008 decision on that basis.

     *4.  Increased Vehicle Delay*

In its petition to reconsider, the Village argued—for the first time—that annual delay at the U.S. 14 intersection reached 118 hours in the spring of 2016. This is not new evidence. As the Board highlighted in its October 30, 2017 deci-

sion, the Village's traffic delay figure is based upon extrapolations of its 2008 and 2011 VISSIM traffic studies using data sets from 2015 and 2016, both of which were available at the time the Village filed its January 10, 2017 petition to reopen. Moreover, the traffic delay calculations were performed on February 8 and February 17, 2017, *before* the Village filed a reply to its original petition to reopen on February 23, 2017. However, the Village did not present this evidence to the Board until it filed its petition for reconsideration in May. Thus, the evidence is not "newly available" because it was available to the Village at the time the record was created; instead, the Village's 118-hour delay figure is "simply newly raised." *See Toledo*, 462 F.3d at 753.

Even if the Village's traffic delay calculation *was* new evidence, the Board did not abuse its discretion in declining to reopen its 2008 decision. The Village submitted similar estimates in both its comments to the 2008 draft EIS and its 2011 petition. On those occasions, the Village's VISSIM model projected 135–249 and 98–100 hours of daily vehicle delay, respectively. Both times, the Board concluded that the amounts did not warrant a grade separation at U.S. 14. The Village's new 118-hour figure falls directly within the scope of those prior computations, and is actually *less* than the Village initially projected in 2008.[13]

---

[13] The Village claims its 118-hour figure shows a 4,639% increase over the delay projection provided in the final EIS. As the Board pointed out, however, the Village's VISSIM study and the final EIS utilized different methodologies, making any attempted comparison "of extremely limited value."

Regardless, the Board's October 30, 2017 decision reasonably echoed its prior admonishments that "exceeding a certain level of vehicle delay at a crossing did not automatically warrant mitigation under the Board's criteria." Rather, "total vehicle delay was only one factor in determining if a crossing was eligible for mitigation." The Village's revised traffic delay figure did nothing to rebut the Board's conclusion that "Barrington's vehicle delays were primarily attributable to preexisting traffic conditions and capacity constraints." Nor did it invalidate the Village's own 2011 traffic analysis that projected 260 hours of vehicle delay even *without* CN's acquisition of the EJ & E line.[14] Thus, as the Board concluded, "even if CN's additional trains have added 118 hours of increased vehicle delay at U.S. 14, Barrington's own model shows that existing capacity constraints at U.S. 14 would contribute much more significantly to the vehicle delays at that crossing."[15] Accordingly, the Village's argument fails.

### 5. *Port of Prince Rupert Expansion*

The Village believes intermodal traffic arriving into PPR has increased exponentially since 2008, and that the port will continue to expand in the near future. This evidence can be fairly characterized as "new." True, the Village mentioned the anticipated PPR expansion in both its response to the draft EIS

---

[14] In its appellate brief, the Village argues that the Board's conclusion that traffic issues at U.S. 14 are primarily attributable to preexisting traffic conditions "is not supported by *any* evidence of record." This claim is belied by the Village's own 2011 traffic analysis. It is further undermined by the final EIS and the Board's 2008 VOBTOA Study.

[15] For the same reasons, the Village's claim that a grade separation is needed "solely because of changed circumstances caused by CN's traffic" is unavailing.

and its 2014 petition to reopen. Since that time, however, the amount of annual PPR container traffic handled by CN has steadily increased, from approximately two million metric tons in 2008 to nearly eight million metric tons in 2015. Evidence of the surge from the last three years was not reasonably available at the time of the Village's prior submissions.

Nevertheless, the Board did not abuse its discretion by refusing to reopen the proceedings on this ground. The Board's April 26, 2017 decision found that although CN's *total* PPR traffic has consistently increased, the Village did not show that rail volume specifically moving through *Barrington* has been materially impacted. Substantial evidence supported this finding. A senior CN executive provided a verified statement that only a portion of PPR traffic moves through Barrington, and that future port expansions would result in only 0.5 additional trains per day traveling across U.S. 14. This, along with the fact that the overall number of trains still falls below 2015 projections, is sufficient to sustain the Board's conclusion that the Village's PPR evidence would not materially alter its 2008 decision.

### 6. *Double-Tracking*

The same goes for the Village's purported fear of double-tracking. Like the PPR expansion, the Village raised the issue of double-tracking in 2014. However, the Village supported the claim in its 2017 petitions with a new Request for Proposal ("RFP") issued by CN in 2016 for double-tracking on the EJ & E line. This sufficiently constitutes new evidence.

However, the Board did not abuse its discretion by determining that CN "has no need and no current plans to double-

track the line in or near Barrington." This finding was supported by a CN executive's verified statement that "[t]he cited RFP was issued as part of CN's regular assessment of capacity and fluidity on its network" in order to "identify those projects that would have the greatest impact on fluidity and capacity." From this assessment, CN concluded that "the expected return on investment would be insufficient to justify such a project." As a result, "CN has not designed or allocated money for a second track in or near Barrington" and would be unlikely to do so in the near future. The Village may be skeptical of CN's assurances, but "it is for the [Board] … to determine what weight the evidence should be given." *See Wis. Cent.*, 112 F.3d at 886.

### 7. *Longer, Slower Trains*

That leaves the Village's emphasis on longer, slower trains. Although the Village raised the same objection in earlier petitions, its alleged figures from 2016 (average train length of 7,800 feet, average speed of 28 miles per hour) are more extreme than those previously cited. Therefore, they sufficiently constitute new evidence. However, they do not mandate a different result. True, CN's trains are slightly longer and slower than originally projected in 2015. But as the Board recognized, at least "some variance between what was projected and what has occurred is expected," particularly given the nine-year gap between the Board's initial projections and the Village's current data. More important is the Village's own study that found less traffic delay than initially projected in 2008, and the Board's supported finding that the U.S. 14 intersection averaged less than one reportable blocked crossing each month in 2016.

### D. Summary

In short, this Court does not possess jurisdiction over the portions of the Village's petition alleging material error. Although we retain cognizance over the Village's allegations of new evidence and substantially changed circumstances, nearly all of these claims were not only available, but considered at earlier stages of this proceeding. The Board did not abuse its discretion in finding that the limited exceptions to this general rule were insufficient to demand material alterations to its prior decision.

At bottom, despite its repeated attempts over the past decade, the Village has never presented sufficient new evidence to overcome the Board's original finding that "the major source of congestion" at U.S. 14 is "excess vehicle demand at existing major thoroughfare intersections" and "existing traffic signals in proximity to one another," not CN's acquisition of the EJ & E line. Consequently, the Board has consistently acted within the scope of its authority by declining to impose the dramatic remedy the Village seeks. We defer to the Board's reasoned judgment.

### III.   Conclusion

For the foregoing reasons, we DENY the petition for review.